In the Matter of the Application of THE BOARD OF RAPID
   TRANSIT RAILROAD COMMISSIONERS OF THE CITY OF NEW
   YORK Relative to Acquiring a Road, Easement and Right
   of Way under Joralemon Street in the Borough of
   Brooklyn.
THE CITY OF NEW YORK et al., Appellants ; HANNAH G. MYN-
   DERSE, as Executrix of WILHELMUS MYNDERSE, Deceased, et
   al., Respondents.

Eminent domain — construction of subway in the city of New
   York under the Rapid Transit Acts — construction of subway
   and operation of railroad therein not a street use under the law,
   or within contemplation of the original owner, who gave per-
   petual right of way for street purposes — damages — abutting
   owner of bed of street entitled to damages caused to support of
   his building and to full value of property taken without deduc-
   tion for benefits — abutting owner who owns no part of the
   street entitled to damages for injuries inflicted upon his ease-
   ments and for the interference with his lateral support.

The construction of a subway in the city of New York under the Rapid
   Transit Act is a business enterprise of the city, through which money
   may be made or lost the same as if it were owned by an ordinary rail-
   road corporation.  It was built by and belongs to the city as a pro-
   prietor, not as a sovereign, and comes within none of the apparent
   exceptions to the command of the Constitution that private property
   shall not be taken for public use without just compensation.
The appropriation of land in order to build a subway is not temporary
   but permanent, and the use made of the street by the city in construct-
   ing a subway and operating, or causing to be operated, a railroad
   therein, is not a street use as that term is known in the law, but is for-
   eign to the purpose for which the street was created.  Such a use was
   not within the contemplation of the original owner of the land when he
   parted with the title thereto for a street, or gave a perpetual right of
   way over the same for the purpose of a street.
If the use were for a street purpose the city would not be liable for dam-
   ages caused by proper construction in any case where it took no land.
   When, however, the construction is not for a street use, even if it is for a
   public use, liability to the owner of the fee attaches to a city the same
   as to a railroad corporation.  It follows that a substructure with the
   physical characteristics and consequences of that under consideration
   is an additional burden upon the fee of the street, and must be governed

by the same principle, so that a railroad constructed beneath the surface of a street is a new burden not contemplated by the original owner of the land when it was devoted to use as a street.

A city on whose behalf a rapid transit railroad is being constructed under a street is liable to an abutting owner owning the bed of the street subject to the easement of street use, for damages caused by the impairment of the support of his buildings on his abutting land by reason of the proper construction of said railroad; and such owner is entitled to the full value of his property actually taken without deduction for benefits, and also to just compensation for the injury done to the remainder.

An abutting owner who owns no part of the street has a right to the lateral support of the land in the street, and has a right or easement covered by the statute which entitles him to compensation for all the damages inflicted upon his property by interference with the lateral support thereof through the proper construction and operation of an underground railroad.

Any agency, even when properly used in the street, not for the improvement thereof but to promote a business enterprise of the city, which inflicts physical injuries upon the property of abutting owners imposes a liability upon the city. Hence, it is liable for the physical injury to an abutter's property resulting from the construction of shafts in the street for the purpose of carrying on the work.

The rights of the parties are not to be determined entirely by the condition of the property as it exists at a particular moment, but the measure of damages should be adapted to the actual injury. Hence, the proper measure of damages is the full value of the fee taken, subject to the public easement of passage, and, both as to naked abutters and those who own the fee, the amount, measured in money, of the physical injuries inflicted and those which with reasonable certainty will be inflicted upon the abutting property by interference with lateral support through the proper construction and operation of the road, including the rental value of the premises during the period, if any, while they are actually untenantable.

It is the duty of the commissioners of appraisal to receive evidence relating to the condition of the properties down to the time of the trial and to note the effect thereon of the work in fact done at that time. Evidence as to the physical injuries which have actually been inflicted and can be seen, touched and measured, is competent and should be received.

All lawful damages caused by the proper conduct of the work contemplated by the statute may be included in the award, and the interest and convenience of all parties will be best subserved by that method.

The statutes in question do not empower the allowance and taxation to the abutting owners in proceedings instituted by a city thereunder of

either their disbursements, costs, counsel fees or extra allowances against the city, and in the absence of a statute providing for costs or allowances for expenses in condemnation proceedings none can be allowed. *Matter of Rapid Transit R. R. Comrs.*, 128 App. Div. 103, modified.

(Argued November 11, 1909; decided December 17, 1909.)

APPEAL from an order of the Appellate Division of the Supreme Court in the second judicial department, entered October 16, 1908, which affirmed in part and reversed in part an order of Special Term confirming the report of commissioners of appraisal in proceedings under the Rapid Transit Act to acquire a perpetual right of way under certain streets in the borough of Brooklyn.

This proceeding was commenced on the 22nd of January, 1903, by the board of rapid transit railroad commissioners of the city of New York to procure the appointment of commissioners of appraisal, pursuant to the Rapid Transit Act, so called, passed in 1891, and the various acts amending and supplementing the same. (L. 1891, ch. 4; L. 1892, chs. 102 and 556; L. 1894, chs. 528 and 752; L. 1895, ch. 519; L. 1896, ch. 729; L. 1900, ch. 616; L. 1901, ch. 587; L. 1902, chs. 533, 542, 544 and 584; L. 1909, ch. 498.)

The commissioners, who were appointed accordingly, took their respective oaths of office on the 25th of January, 1903, and, after many sessions during which much evidence was taken, made their "first separate report" on the 22nd of December, 1905, whereby they made the following awards:

1. To Wilhelmus Mynderse, as the owner of premises fronting on Joralemon street in the borough of Brooklyn, including the fee to the center of that part of the street directly in front thereof, the sum of $15,000, " as compensation for the portion of his land which has been taken in Joralemon Street in this proceeding, including the injury to his property upon the premises above described, adjoining, which would necessarily arise from the proper construction, maintenance and operation of a tunnel under the surface of Joralemon Street in the manner as set forth in the plans and specifications and contract, above referred to."

2. To George B. Abbott, as the owner of premises fronting on Joralemon street, including the fee to the center of that part of the street directly in front thereof, the sum of $6,000, as compensation for the portion of his land taken and the injury to his adjoining property, on the basis mentioned in the award to Mr. Mynderse.

3. To John Notman as the owner of land fronting on Joralemon street, but not including any part of the street in front thereof, as the same belonged to unknown owners who were awarded a nominal amount, "the sum of $12,000 as damages caused by the taking of the easement of support" appurtenant to his premises abutting on said street. "This easement," as the commissioners stated, "is a valuable adjunct to his property and we consider that under the provisions of the statute under which this proceeding is taken, is one for which he is entitled to compensation."

On the 31st of May, 1906, the report of the commissioners was in all things confirmed by an order of the Special Term, which denied, for the want of power, a motion made in behalf of said owners to be allowed counsel fees, taxable costs and disbursements; and also denied, upon the same ground, a motion made in behalf of the commissioners of appraisal for an extra allowance to themselves.

Messrs. Mynderse and Abbott appealed to the Appellate Division from that part of the order which affected their respective premises, upon the ground that their awards were inadequate, and also from that part which denied their application for counsel fees, costs and disbursements.

Mr. Notman appealed only from so much of the order as denied his application for counsel fees, etc.

The board of rapid transit commissioners, in behalf of the city of New York, appealed from all of said order, except the part relating to allowances, upon the ground that the city is not liable to any abutting owner to any extent whatever.

The commissioners of appraisal appealed from that part of the order which denied their application for an extra allowance.

The Appellate Division, after reciting that Mynderse,

Abbott and Notman had died during the pendency of the appeal, and that their personal representatives had been duly substituted, reversed the order of the Special Term so far as it related to the awards made to Mynderse and Abbott, as well as that part which denied costs and allowances to the respective appellants, and affirmed the order so far as it related to the award made to Mr. Notman.   The proceeding was sent back to the commissioners for further examination, with instructions in relation to the measure of damages and the reception and consideration of evidence bearing upon the claims of Mynderse and Abbott, in accordance with an opinion which is reported in 128 App. Div. 103.

The city of New York and the board of rapid transit railroad commissioners appealed to the Court of Appeals, as a matter of right, from so much of the order of affirmance as related to the award made to Mr. Notman, and, permission having been given by the Appellate Division, they also appealed from that part of the order of affirmance relating to the awards made to Mynderse and Abbott.

The following questions were certified to this court :

" 1. In the case of the construction, on behalf of a city, of a rapid transit railroad under the powers conferred by the Rapid Transit Act, chapter 4 of the Laws of 1891, and acts amendatory thereof, under the streets of said city, of which streets the fee ownership, subject to the public easement of street use, is in the abutting owners, is there any liability on the part of such city to said abutting owners for damages arising from the proper construction of said railroad ?

" 2. Under the state of facts set forth in question 1, does a city on whose behalf such rapid transit railroad is constructed become for the purpose of such construction a railroad corporation, having no more rights in the street under which said rapid transit railroad is being constructed than would belong to any other corporation, and no other or higher right to take private property than would belong to an ordinary railroad corporation ?

" 3. Does the construction of a rapid transit railroad under

a street, under the state of facts set forth in question 1, con-
stitute an added burden on the street for which the abutting
owners owning the bed of the street, subject to the easement
of street use, are entitled to compensation ?

" 4. Under the state of facts set forth in question 1, is a
city on whose behalf a rapid transit railroad is being con-
structed under a street, liable to an abutting owner owning
the bed of the street subject to the easement of street use, for
damages caused by the impairment of the support of his build-
ings on his abutting land, by reason of the proper construction
of said railroad ?

" 5. If question 1 be answered in the affirmative, are the
damages in a proceeding to acquire property or rights or ease-
ments therein, for the purpose of the construction of a rapid
transit railroad in a city under the Rapid Transit Act, chap-
ter 4 of the Laws of 1891, and acts amendatory thereof, to
be determined as of the time of the vesting under said acts,
of title in said city to said property, rights or easements ?

" 6. If question 1 be answered in the affirmative, are the
abutting owners therein mentioned, under the state of facts
therein set forth, entitled to have taken into consideration the
damages resulting to them by the necessary construction of
shafts in the street near to their premises, in so far as these
would have a tendency to diminish the market value of the
property by reason of the consequential damages ?

" 7. If question 1 be answered in the affirmative, are the
damages in a proceeding to acquire property or rights or
easements therein, for the purpose of the construction of a
rapid transit railroad in a city under Laws 1891, chapter 4,
and acts amendatory thereof, measured and limited by the
difference between the market value of the property unin-
cumbered by the easements acquired and its market value
subject to such easements ?

" 8. If questions 1, 5 and 6 should all be answered in the
affirmative, have the commissioners of appraisal, in determin-
ing the market value of the abutting property, subject to the
property rights or easements required in a proceeding as set

forth in question 5, the right to take into consideration the facts and circumstances not apparent and foreseen at the date of the vesting of title to such property rights or easements, but subsequently developed by the actual construction and operation of the road, and which, if apparent or foreseen at the date of the vesting of title, would have had the effect of increasing or decreasing the market value of the premises, subject to such property rights or easements?

"9. Does the Rapid Transit Act, Laws of 1891, chapter 4, and acts amendatory thereof, empower the allowance and taxation to the abutting owners in proceedings instituted by a city thereunder of their disbursements, costs, counsel fees and extra allowances therein against such city?"

*Francis K. Pendleton, Corporation Counsel (Joel J. Squier* and *Theodore Connoly* of counsel), for appellants. The city of New York in the construction, under authority of the Rapid Transit Act, of the subway railroad under its streets acted in its public capacity as agent of the state. (*Quill* v. *Mayor, etc.,* 36 App. Div. 476; *F. Ins. Co.* v. *Keeseville,* 148 N. Y. 46; *People ex rel. Mayor, etc.,* v. *Assessors of Brooklyn,* 111 N. Y. 505; *Hughes* v. *City of Auburn,* 161 N. Y. 96; *Radcliff* v. *City of Brooklyn,* 4 N. Y. 195; *Uppington* v. *City of New York,* 165 N. Y. 222; *Atwater* v. *Trustees,* 124 N. Y. 602; *Sauer* v. *City of New York,* 180 N. Y. 27; 206 U. S. 536; *Witcher* v. *Holland Water Co.,* 66 Hun, 619; 142 N. Y. 626; *Wormser* v. *Brown,* 149 N. Y. 163.) When a municipal corporation, exercising the discretionary and permissive powers conferred by the legislature upon all the cities of the state, constructs improvements in its streets which result in no immediate advantage to the municipality, but are for the benefit of the people of the entire state, it acts in its governmental capacity as one of the political divisions of the state, and not as a private corporation. (*Prime* v. *City of Yonkers,* 192 N. Y. 105; *Heiser* v. *Mayor, etc., of New York,* 104 N. Y. 68; *Maxmillian* v. *Mayor, etc.,* 62 N. Y. 160; *Tone* v. *Mayor,* 70 N. Y. 157;

*Lynch* v. *Mayor, etc.*, 76 N. Y. 60 ; *O'Donnel* v. *City of Syracuse*, 184 N. Y. 1.) The construction and operation of a rapid transit railroad in a tunnel under the surface of a street is a public use consistent with the uses for which streets are publicly held. (*Matter of N. Y. D. R. Co.*, 107 N. Y. 42 ; *Transportation Co.* v. *Chicago*, 99 U. S. 635 ; *People* v. *Kerr*, 27 N. Y. 188 ; *Plant* v. *L. I. R. Co.*, 10 Barb. 26 ; *Sears* v. *Crocker*, 184 Mass. 586 ; *S. P. Co.* v. *Mayor, etc.*, 152 N. Y. 257 ; *Kelsey* v. *King*, 32 Barb. 410 ; Elliott on Roads & Streets [2d ed.], § 16 ; *Sauer* v. *City of New York*, 206 U. S. 536 ; *Kellinger* v. *F. S. S. R. R. Co.*, 50 N. Y. 206 ; *Comm.* v. *Morrison*, 197 Mass. 203 ; *Cheney* v. *Barker*, 198 Mass. 356 ; *Associates* v. *City of Boston*, 201 Mass. 585.) The Rapid Transit Act (L. 1891, ch. 4, as amd.) does not enlarge the constitutional right to compensation, or add a new right thereto, not guaranteed by the State Constitution. It, therefore, does not make the city liable for consequential injuries arising from the construction of the subway. (*A. B. N. Co.* v. *E. R. R. Co.*, 129 N. Y. 252 ; *Story* v. *N. Y. E. R. R. Co.*, 90 N. Y. 122 ; *Lahr* v. *El. R. R. Co.*, 104 N. Y. 268 ; *Kane* v. *El. R. R. Co.*, 125 N. Y. 164 ; *Radcliff* v. *City of Brooklyn*, 4 N. Y. 195 ; *Uppington* v. *City of New York*, 165 N. Y. 222 ; *Booth* v. *R., W. & O. T. R. Co.*, 140 N. Y. 267 ; *Dorrity* v. *Rapp*, 72 N. Y. 307 ; *Finnegan* v. *Eckerson*, 32 App. Div. 233 ; *Transportation Co.* v. *Chicago*, 99 U. S. 635.) The city of New York being vested with a public easement for street purposes in the land forming the bed of Joralemon street possessed the same right to use and improve the street for public purposes, and to appropriate it to new public uses demanded by the public need and authorized by the legislature as if it held title to the fee of the street in trust for public use. (*Flack* v. *Village of Green Island*, 122 N. Y. 107 ; *City of Cohoes* v. *D. & H. C. Co.*, 134 N. Y. 402 ; *Harriman* v. *Howe*, 78 Hun, 280 ; *Town of Corning* v. *Head*, 86 Hun, 12 ; *Jorgensen* v. *Squires*, 144 N. Y. 280 ; *Eels* v. *A. T. & T. Co.*, 143 N. Y. 133 ; *Palmer* v. *L. E. Co.*, 158 N. Y. 231 ; *Barney* v. *Keokuk*, 94

U. S. 324; *Story* v. *N. Y. E. R. R. Co.*, 90 N. Y. 122.)
The property or property rights of the claimants, which were
taken by the city for the construction and operation of the road
under Joralemon street, had only a nominal value. (*Radcliff*
v. *Brooklyn*, 4 N. Y. 195; *Uppington* v. *City of New York*,
165 N. Y. 122; *Robert* v. *Sadler*, 104 N. Y. 229; *Booth* v. *R.*,
*W. & O. T. R. Co.*, 140 N. Y. 267; *Dorrity* v. *Rapp*, 72 N. Y.
307; *Finnegan* v. *Eckerson*, 32 App. Div. 233; *Transpor-
tation Co.* v. *Chicago*, 99 U. S. 635; *Sauer* v. *City of New
York*, 180 N. Y. 27; 206 U. S. 536; *Prime* v. *City of Yon-
kers*, 192 N. Y. 105.)    Annoyance or inconvenience to persons
or property in the vicinity of a public improvement in conse-
quence of the work of construction is not an injury to property
or a taking of property for public use for which compensation
must be made. (*Lester* v. *Mayor*, 79 Hun, 479; 150 N. Y.
578.)    The construction of a rapid transit railroad beneath the
surface of a public street does not impose an additional servi-
tude upon the street for which abutting owners, even though
they also own the fee of the street, are entitled to compensa-
tion. (*Sears* v. *Crocker*, 184 Mass. 586; *Adams* v. *S. & W.
R. R. Co.*, 11 Barb. 414; *Matter of Yonkers*, 117 N. Y. 564;
*Crooke* v. *F. W. W. Co.*, 29 Hun, 245; *Eels* v. *A. T. & T. Co.*,
143 N. Y. 133; *Craig* v. *R., C. & B. R. R. Co.*, 39 N. Y. 404;
*Peck* v. *S. Ry. Co.*, 170 N. Y. 298.)    The correct rule of dam-
age, providing the city is obliged to make any compensation to
the abutting owners, is (1) the value of the land taken (which,
of course, from its nature is of but nominal value); (2) damages
to the abutting property incident to the lawful — not the
negligent — use to which the property so taken is applied,
this damage being — as there could be no damage from inter-
ference with the surface use of the street or with the ease-
ments of light, air or access, or from noise, or smoke, or ashes,
or vibration — merely nominal.    Assuming, however, that
under the Rapid Transit Act the city of New York is liable
for physical damage to buildings by the construction of the
subway, the proper measure of such damage is the cost of
repairing the building, plus the loss of rents, if the building

be rendered untenantable for any period. (*Kirkover* v. *S. B. R. R. Co.*, 176 N. Y. 301; *Bohm* v. *M. E. R. R. Co.*, 129 N. Y. 576; *Lester* v. *Mayor, etc.*, 79 Hun, 479; '150 N. Y. 578; *Hartshorn* v. *Chaddock*, 135 N. Y. 116.) The claimants are not, nor is either of them, entitled to costs nor to an extra allowance. (*Matter of City of Brooklyn* v. *L. I. W. S. Co.*, 148 N. Y. 107; *Matter of Comrs. of Central Park*, 50 N. Y. 493; *Matter of Low*, 103 App. Div. 530; *Matter of City of Brooklyn*, 148 N. Y. 107; L. 1891, ch. 4, § 62.)

*George S. Coleman* and *Leroy T. Harkness*, for Public Service Commission, intervening.

*Frederick B. Campbell* and *George W. Hinckley* for Hannah G. Mynderse, as executrix, et al., respondents. The construction and operation under a city street of a subway railroad is not the occupancy of the street for a street use or purpose. (*Palmer* v. *L. L. Co.*, 158 N. Y. 231; *Wager* v. *T. U. Ry. Co.*, 25 N. Y. 526; *Peck* v. *S. R. R. Co.*, 170 N. Y. 299; *Paige* v. *Schenectady Ry. Co.*, 178 N. Y. 102, 109; *Fries* v. *El. R. R. Co.*, 169 N. Y. 285; *Reining* v. *N. Y., L. & W. Ry. Co.*, 128 N. Y. 157; *Eels* v. *A. T. & T. Co.*, 143 N. Y. 133; *Muhlker* v. *N. Y. & H. R. R. Co.*, 197 U. S. 541.) Real property, as such, abutting upon a public street, carries with it special rights in the street in the nature of property, entitling the owner of such real property to prevent the use of the street for purposes other than street uses. (*Drake* v. *H. R. R. Co.*, 7 Barb. 508; *Gould* v. *H. R. R. R. Co.*, 6 N. Y. 522; *Donahue* v. *K. G. Co.*, 181 N. Y. 313.) The value or equivalent of this property right is the actual damage thereby caused to the real estate. (*Bohm* v. *M. E. R. Co.*, 129 N. Y. 576; *Henderson* v. *N. Y. C. R. R. Co.*, 78 N. Y. 423; *Newman* v. *M. E. R. Co.*, 118 N. Y. 618; *S. B. Ry. Co.* v. *Kirkover*, 176 N. Y. 301; *Matter of G. C. Comm.*, 6 App. Div. 327; *Drucker* v. *M. Ry. Co.*, 106 N. Y. 157; *R., W. & O. R. R. Co.* v. *Gleason*, 42 App. Div. 530.) The legislature in authorizing the taking of property necessary for the construction and operation of the subway presumably intended

to provide, and did provide, for full compensation, otherwise the act would be unconstitutional. (*Bohmer* v. *Haffen*, 161 N.Y. 393; *People ex rel. Kemmler* v. *Durston*, 119 N.Y. 569; *Matter of Stilwell*, 139 N. Y. 337.) It is immaterial whether the abutter's property rights be taken by the city acting in a governmental or in a proprietary capacity; but it would seem that the city, in the construction of a subway rapid transit railway, was acting in its private or proprietary capacity and not in the exercise of a governmental function. (Cooley's Const. Lim. [3d ed.] 507; *People* v. *Morris*, 13 Wend. 325; *Sweet* v. v. *Rechel*, 159 U. S. 380.) The Special Term had power to make a reasonable allowance for costs, counsel fees and extra allowances. (L. 1894, ch. 752, § 9; L. 1901, ch. 587, § 62; Code Civ. Pro. § 3240; *Matter of City of Brooklyn*, 148 N. Y. 107; *Matter of L. & H. F. R. R. Co.*, 68 Hun, 252; *Matter of Grade Crossing Commissioners*, 17 App. Div. 54, 62; *Matter of Grade Crossing Commissioners*, 20 App. Div. 271.)

*Charles W. West* for Eva T. Abbott, as executrix, respondent. The subway was not a governmental work by a municipal corporation. . It was a private enterprise of the city of New York, undertaken by it as, and in which it assumed the responsibilities of, a private corporation. (*Bailey* v. *Mayor, etc.*, 3 Hill, 531; *People ex rel. D., etc., R. R. Co.* v. *Batchellor*, 53 N. Y. 128; *Bamber* v. *City of Rochester*, 26 Hun, 587; 97 N. Y. 625; *Prime* v. *City of Yonkers*, 192 N. Y. 105; *Ryan* v. *City of New York*, 177 N. Y. 271; *Williams* v. *Vil. of Port Chester*, 97 App. Div. 84; 183 N. Y. 550; *N. Y. & B. S. Co.* v. *City of Brooklyn*, 71 N. Y. 580; *Cain* v. *City of Syracuse*, 95 N. Y. 83; *Mac-Mullin* v. *City of Watertown*, 187 N. Y. 37; *Caponigri* v. *Altieri*, 155 N. Y. 255; *Paltey* v. *Egan*, 132 App. Div. 254.) The city of New York is liable to the fee owners of the bed of Joralemon street, taken for its subway railroad, precisely as and to the same extent that any railroad or other private corporation would in such case be liable. (*H. & M. R. R. Co.* v. *Wendel*, 193 N. Y. 166; *Baxter* v.

*McDonnell*, 154 N. Y. 432.) The rule of damages applied
by the commissioners of appraisal did not comply with the
requirements of the Rapid Transit Act. (*Matter of City of
New York*, 122 App. Div. 416; *Matter of N. Y. & B. Bridge*,
18 App. Div. 8; *Matter of Water Comrs.*, 96 N. Y. 351;
*Matter of Poughkeepsie Bridge*, 108 N. Y. 483; *City of
Syracuse* v. *Stacy*, 45 App. Div. 249; *Matter of Gilroy*,
26 App. Div. 314; *Brewster* v. *Rodgers Co.*, 169 N. Y. 73;
*S., etc., Assn.* v. *Mayor, etc.*, 8 App. Div. 230; 152 N. Y.
257.) The construction of the Rapid Transit Act claimed by
the city and adopted by the commissioners, if sustained by
this court, necessarily determines that act to be unconstitu-
tional and void, as being obnoxious both to the requirement
of the State Constitution that "private property shall not be
taken for public use without just compensation," and to the
provision of the fourteenth amendment to the Constitution
of the United States, which is as follows: "Nor shall any
State deprive any person of life, liberty or property without
due process of law." (Const. of N. Y. art. 1, § 6; *Matter of
Consolidated Gas Co.*, 190 N. Y. 350; 3 Suth. on Damages,
§§ 1072, 1073; *City of Buffalo* v. *Pratt*, 131 N. Y. 293;
*S. B. Ry. Co.* v. *Kirkover*, 176 N. Y. 301; *Koelsch* v. *City
of New York*, 34 App. Div. 98; *Miller* v. *Maujer*, 82 App.
419; *Bloomgarden* v. *Hoffmann*, 116 App. Div. 719; *Matter
of Sugden*, 174 N. Y. 87; *Bohmer* v. *Haffen*, 161 N. Y. 390;
*Matter of N. Y. & L. I. B. Co.*, 148 N. Y. 540; *Brewster*
v. *Rogers*, 189 N. Y. 73.) To save its constitutionality, the
Rapid Transit Act must contain within itself full provision
for payment of all damages suffered by reason of work done
under its authority. If otherwise, and although there remained
to the owner, outside the act, a common-law right of action
for damages suffered by him against the city or the contractors
carrying out its work, that fact would not make the act a
constitutional statute. (*S., etc., Assn.* v. *Mayor, etc.*, 8 App.
Div. 230; *Foster* v. *Scott*, 136 N. Y. 577; *G. A. R. E. Co.*
v. *Myers*, 32 App. Div. 41; Elliott on Roads & Streets,
249; *Bates* v. *Holbrook*, 68 App. Div. 25; 171 N. Y. 460;

*Haefelin* v. *McDonald*, 96 App. Div. 213; *Carpenter* v. *City of New York*, 115 App. Div. 552.) The Appellate Division adopted the true measure of damages. (*S. B. Ry. Co.* v. *Kirkover*, 176 N. Y. 301; *N. Y. C. & H. R. R. R. Co.* v. *Marshall*, 120 App. Div. 742; *Matter of B. U. El. R. R. Co.*, 95 App. Div. 108; *Peck* v. *Schenectady R. Co.*, 170 N. Y. 298; *City of Buffalo* v. *Pratt*, 131 N. Y. 293; *Hymes* v. *Estey*, 133 N. Y. 342; *Village of Olean* v. *Steyner*, 135 N. Y. 341; *B., etc., R. R. Co.* v. *F. B. Church*, 108 U. S. 317; 3 Suth. on Dam. § 1075; *Matter of N. Y., etc., Ry. Co.*, 27 Hun, 116; *Matter of Gibney*, 85 Hun, 424; *Matter of Comrs.*, 59 App. Div. 498; Lewis on Em. Dom. §§ 478–480.) Costs, disbursements and allowances to counsel are authorized by the Rapid Transit Act and should be awarded. (L. 1901, ch. 587; *Matter of City of New York*, 125 App. Div. 219; *Matter of Simmons*, 61 Misc. Rep. 352; *Stevens* v. *C. Nat. Bank*, 168 N. Y. 560; Williams on Costs, 1.)

VANN, J.    The Rapid Transit Act authorizes the city, through its board of rapid transit commissioners, to acquire by contract or condemnation " any real estate and any rights, terms and interests therein, any and all rights, privileges, franchises and easements, whether of owners or abutters, or others to interfere with the construction or operation of such road or to recover damages therefor, which, in the opinion of the board it shall be necessary to acquire or extinguish for the purpose of constructing and operating such road free of interference or right of interference." (Rapid Transit Act, L. 1901, ch. 587, § 39.) The same section further provides that " the word ' property,' hereinafter used shall be deemed to include any such real estate, and any rights, terms and interests therein, and any such rights, privileges, franchises and easements, whether of owners, abutting owners or others."

Pursuant to this authority said board, deeming it necessary, as it recited in its petition, " to acquire a permanent and perpetual underground right, easement and right of way for the

construction, operation and maintenance in perpetuity of a
rapid transit railroad" through Joralemon street, among
others, instituted this proceeding to condemn certain rights
and easements, including "the right to permanently and per-
petually maintain and operate a railroad through the said
subway so to be constructed in accordance with the provisions
of" the Rapid Transit Act and its amendments, "and the right
at reasonable times and in reasonable manner to enter upon the
said premises so far as may be necessary for the construction,
maintenance and operation of said railroad."

Joralemon street is an old residential street, well built up
with a good class of houses.  As it extends from the river to
Henry street and passes by the Mynderse and Abbott prop-
erties, it is sixty feet wide between the building lines, with a
carriageway of thirty feet and a sidewalk on either side fifteen
feet in width.  From Henry street to the City Hall, passing
by the Notman property, it is fifty-five feet wide, with a car-
riageway of twenty-five feet and sidewalks of about fifteen
feet each.  The subway consists of two tubes, parallel but
not close together, which occupy a space forty-two feet eight
inches wide, located at a depth below the surface of the street
varying from thirty to fifty-two feet.  Each tube has an out-
side diameter of sixteen feet eight inches, and extends in part
under the adjacent sidewalk.  In each tube is a single-track
railway over which trains of cars operated by electricity run
every few minutes, the first stop being at Borough Hall.
The cars are of steel and weigh from forty-four to forty-seven
tons each.  The excavation for the tube was made by means
of a shield, or steel cylinder, slowly forced ahead by hydraulic
pressure of a thousand tons, the excavated material being
taken to the surface through two shafts, one for each tube,
about twenty by twenty-four feet, the latter being the trans-
verse measurement, or across the tunnel.  The diameter of
the excavation made for each tube was about seventeen feet.
The north shaft was sixty-seven feet deep and the south shaft
about sixty-three.  The shell of the tubes is constructed of
heavy cast iron plates bolted together so as to form a ring fifty-

five feet in circumference and twenty-two inches thick, with a concrete lining of six inches in addition.

In constructing the tunnel a space of between one and two inches was left between the outer surface of the shell and the place where the outer surface of the shield was before it was withdrawn in the ordinary course of operation, but this space, which amounted to eight and one-half cubic feet per running foot, was filled with liquid grout forced in under high pressure. While this was done to minimize the settling of the soil around the tubes, it did not wholly prevent the caving in of the material through which the shield was driven, but it is the best known method of construction, as the evidence tended to show. The general character of the soil through which the shield was forced is dry sand with a little gravel, compact when confined but somewhat movable when unconfined. Forcing the shield through the soil compressed it and when expansion gradually came through the action of gravitation and the seepage of water, holes or vacancies were left until they were filled by the subsidence of the land on which stood the buildings of abutting owners. One of the witnesses said that "sand must of necessity be confined and if it is disturbed it runs away like water." As the tunnel advanced, a trench three or four feet deep was dug in the street and filled with water, so that by soaking through the ground it would carry the sand with it and fill the vacant spaces more quickly than would otherwise have been the case.

The effect of the work upon the abutting lots and the fine, large dwelling houses thereon, was, owing to a substantial settling of the soil, to seriously injure the structures, by cracking the walls and floors, breaking the plumbing and the like; to render them unfit to live in for about eighteen months, and to require an expenditure of large sums of money, varying from $3,000 to upwards of $20,000 in order to restore them to their former condition. Witnesses testified that some of the buildings were "wrecked, * * * that is, cracked all to pieces, front walls and the interior walls." Some of the cracks were three inches wide and some of the walls

had to be taken down and rebuilt, with concrete footings re-enforced by steel rods, so as to provide against further settling. The shield when forced through the soil shook every house within two hundred feet and the front walls of the adjoining buildings had to be supported by shoring timbers to keep them from falling. Mr. Mynderse testified that for more than a year his house "was absolutely uninhabitable, owing to breaks in the walls and the difficulties with the plumbing and gas pipes." Sitting in the interior of his house he could look out into the street through the cracks. One of the chimneys fell and other injuries were inflicted which were stated in great detail by the witnesses. The houses of the other claimants were injured in substantially the same way.

So many questions were argued before us that in an opinion of reasonable length we can do little more than announce our conclusions as to the most of them, and little more is needed in view of the elaborate discussion of the case in the learned opinion of the Appellate Division. In order to avoid confusion, we will endeavor to consider each question by itself, although to some extent the discussion of one may run into that of another.

1. Was the action of the city in building the subway governmental or proprietary in character?

The city owns the subway, and it is a railroad corporation so far as the construction, operation and leasing thereof is concerned. It was not required, but simply permitted, to build and operate the road. It is authorized to lease its railroad, either for "a specified sum of money or a specified proportion of income, earnings or profits;" or it may operate the road itself and charge such rates of fare for the transportation of persons and property as may be fixed by its own boards and officers. (L. 1909, ch. 498, §§ 27 and 30.) In other words, the subway is a business enterprise of the city, through which money may be made or lost, the same as if it were owned by an ordinary railroad corporation. It was built by and belongs to the city as a proprietor, not as a sovereign. (*Maxmilian* v. *Mayor, etc., of N. Y.*, 62 N. Y. 160; *Missano* v. *Mayor, etc., of*

*N. Y.*, 160 N. Y. 123; *South Carolina* v. *United States* 199 U. S. 437.)

The construction of the subway comes within none of the apparent exceptions to the command of the Constitution that private property shall not be taken for public use without just compensation. (Art. 1, § 6.) The appropriation of land in order to build it is not temporary, but permanent, and while necessary for a public purpose, it is not necessary in order to protect the public from the danger of sudden and overwhelming calamity such as may spring from war, pestilence or fire. As was said by Judge Earl in an important case : " There never can be any necessity under the police power or the law of necessity to permanently appropriate land to the public use without compensation. It may temporarily be interfered with or appropriated; necessity may justify so much ; but when the necessity passes away, the right ceases." (*Matter of Cheesebrough*, 78 N. Y. 232, 237.)

We regard further discussion of this subject as unnecessary, since the capacity in which the city acted is not of primary importance, as claimed by some of the counsel, because it cannot permanently appropriate private property either as a municipal government or as a railroad corporation without paying for it.

2. The use made of the street by the city in constructing the subway and operating, or causing to be operated, a railroad therein, is not a street use as that term is known in the law. As we have recently said, " There is a broad distinction between a municipal purpose and a street purpose." (*Palmer* v. *Larchmont Electric Co.*, 158 N. Y. 231, 235.) We have held that a subway of the kind in question is built for a city purpose, because it is necessary for the general welfare of the people of the municipality, is public in character, sanctioned by its citizens and authorized by the legislature, and hence the city has power to construct and pay for it. (*Sun Printing & Publishing Assn.* v. *Mayor, etc., of N. Y.*, 152 N. Y. 257, 267.) A street purpose, on the other hand, is exclusively a highway purpose and any use of the street, which improves or benefits

7

it as a highway, is a proper street use. Sewers, which drain
surface waters, electric lights, which make traveling safer, and
water mains, that may be used to sprinkle and clean, are all
street purposes, as was shown by Judge HAIGHT in the *Larch-
mont* case. Telegraph poles, however, are not erected for a
street purpose, because, as Judge PECKHAM said in a leading
case, " the primary or fundamental idea of a highway is that it
is a place for uninterrupted passage by men, animals or vehicles,
and a place by which to afford light, air and access to the prop-
erty of abutting owners, who, in this respect, enjoy a greater
interest in the street than the general public, even though
their title to the land stops with the exterior line of the
street. It is not a place which can be permanently and exclu-
sively appropriated to the use of any person or corporation,
no matter what the business or object of the latter might be."
(*Eels* v. *American Telephone & Telegraph Co.*, 143 N. Y.
133, 140.)

The law thus announced was not new, for thirty years
before this court had said : " It is quite apparent that the use
by the public of a highway and the use thereof by a railroad
company is essentially different. In the one case every per-
son is at liberty to travel over the highway in any place or
part thereof, but he has no exclusive right of occupation of
any part thereof except while he is temporarily passing over
it. It would be trespass for him to occupy any part of the
highway exclusively, for any longer period of time than was
necessary for that purpose and the stoppages incident thereto.
But a railroad company takes exclusive and permanent pos-
session of a portion of the street or highway. It lays down
its rails upon, or imbeds them in the soil, and thus appro-
priates a portion of the street to its exclusive use, and for its
own particular mode of conveyance. In the one case all per-
sons may travel on the street or highway in their own com-
mon modes of conveyance. In the other no one can travel
on or over the rails laid down except the railroad company
and with their cars specially adapted to the tracks. In the
one case the use is general and open alike to all. In the

other it is peculiar and exclusive." ( *Wager* v. *Troy Union R. R. Co.*, 25 N. Y. 526, 532.)

Therefore, a use made of a street which does not help it as a highway " for uninterrupted passage by men, animals and vehicles " is not a street use, but is foreign to the purpose for which the street was created.  Such a use was not within the contemplation of the original owner of the land when he parted with the title thereto for a street, or gave a perpetual right of way over the same for the purpose of a street.

The subway occupies a part of the street, which, although beneath the surface, might, by proper construction and change of grade, be used for ordinary highway purposes and traveled upon freely, without license or recompense, by persons using their own vehicles or their own methods of transportation. The occupation by the subway and its trains of cars is exclusive, for no one may enter either without payment of fare. Highways are free and open to all the people ; the subway is not.  Highways are for the exclusive use of none ; the subway is for the exclusive use of one.  Highways are for travel by means under the exclusive control of the traveler ; the subway is for travel by means under the exclusive control of its owner or operator.

3. The result of the principle thus announced, as applied to the case in hand, is obvious.  If the use were for a street purpose the city would not be liable for damages caused by proper construction in any case where it took no land.  A city may change the grade of a street by so cutting it down as to cause the bank forming a natural support to the premises of an abutting owner to fall in without liability if the work is done without negligence or malice and no land is actually taken, as was held in *Radcliff's Exrs.* v. *Mayor, etc., of Brooklyn* (4 N. Y. 195).  Under like circumstances it may build a huge sewer, even if the same result follows, or construct an elevated viaduct, or two-story street for ordinary public travel, without liability. ( *Uppington* v. *City of New York*, 165 N. Y. 222 ; *Sauer* v. *City of New York*, 180 N. Y. 27.)

When, however, the construction is not for a street use,

even if it is for a public use, liability to the owner of the fee attaches to a city the same as to a railroad corporation. From the *Craig* case in 1868 to the *Peck* case in 1902, with the long line of cases intervening, the position of this court has been uniform and consistent in maintaining that surface structures and superstructures are an additional burden on the fee of the street. (*Craig* v. *Rochester City & Brighton R. R. Co.*, 39 N. Y. 404; *Peck* v. *Schenectady Ry. Co.*, 170 N. Y. 298.) It follows as a logical sequence that a substructure with the physical characteristics and consequences of that under consideration, must be governed by the same principle, so that a railroad constructed beneath the surface of a street is a new burden, not contemplated by the original owner of the land when it was devoted to use as a street. Mynderse and Abbott, therefore, are entitled upon the facts as they now appear to the full value of their property actually taken without deduction for benefits, and also to just compensation for the injury done to the remainder. (*South Buffalo Ry. Co.* v. *Kirkover*, 176 N. Y. 301.)

4. The Notman property involves a different and more difficult question which has led to a division of judgment in the court. No part of Mr. Notman's land was actually taken, the fee of the street in front being in unknown owners, but such serious injury was inflicted upon his abutting premises that if he is entitled to no compensation, he indirectly contributes a large sum toward the construction of a railroad in which he has no greater interest than citizens generally. It is argued in behalf of the intervenor that public policy requires this, so that with the cost reduced more subways may be built, but sound public policy forbids that citizens in one part of a city be injured in order to benefit citizens in another part. The growth of the city of New York cannot be legally promoted at the special expense of one class of its citizens.

We all agree, however, that an abutting owner who owns no part of the street has a right to the lateral support of the land in the street, although we differ as to the origin and reason of the rule. It is contended that the doctrine rests upon

a local statute, passed over fifty years ago, long before subways were thought of. That statute is as follows: "That whenever excavations hereafter commenced, for building or other purposes, on any lot or piece of land in the city and county of New York and the city of Brooklyn, shall be intended to be carried to the depth of more than ten feet below the curb, and there shall be any party or other wall, wholly or partly on adjoining land and standing upon or near the boundary lines of such lot, the person causing such excavations to be made, if afforded the necessary license to enter on the adjoining land, and not otherwise, shall at all times from the commencement until the completion of such excavations, at his own expense, preserve such wall from injury, and so support the same by a proper foundation that it shall remain as stable as before such excavations were commenced." (L. 1855, ch. 6.)

It is doubtful whether the words "any lot or piece of land" were intended to include land in the street, and it is even more doubtful whether by "excavations for building or other purposes" any excavation was meant other than one made from the surface downward in the usual way, as contrasted with one in the nature of a tunnel far underground. Such excavation under a street was unknown at the date of the statute. The reference to "the curb," to "any party or other wall," to "adjoining lands," to "the necessary license" and to "the boundary lines of such lot," as well as the direction to "the *person* causing such excavations to be made," to preserve such wall from injury "at his own expense," indicate legislation to govern the relations of lot owners, rather than the relation of the city to lot owners. Otherwise the city could not excavate for a strictly street purpose without coming within the obligation to protect the buildings of adjoining owners when the depth of ten feet was exceeded. Even if the statute affords protection in the city of New York, it may be repealed at any time, and if not repealed, it would leave abutting owners in other cities of the state, with one or two exceptions, entirely **without** protection.

I am, personally, of the opinion that a mere abutter, independent of said local statute, by virtue of the Rapid Transit Act, the situation of his premises and their proximity to the street, is entitled to lateral support and to freedom from physical interference with his abutting property. The value of a city lot depends on the value of the building erected, or which may be erected thereon. If the building of an abutting owner is torn down wholly or in part by a railroad company in constructing its road, and the city so far as this case is concerned is merely a railroad company, it is a virtual appropriation *pro tanto* of that building and logically calls for compensation. The Rapid Transit Act recognizes the easements of abutting owners as property, without reference to their ownership of the street.   (§ 39.)   It is well established that a railroad corporation cannot interfere with the easements of light, air and access without liability, and if it cannot interfere with these easements, which are merely incidental to the convenient use of a building, without making compensation, can it destroy the building itself, or crack its walls and break its plumbing with no liability whatever? The answer to this question may be found in an opinion of the Supreme Court of the United States rendered in the Harlem viaduct litigation, overruling this court in three cases and sustaining it in one, in these words: "There is something of mockery to give one access to property which may be unfit to live on when one gets there." (*Muhlker* v. *New York & Harlem R. R. Co.*, 197 U. S. 563.)

It is claimed, however, that as a railroad corporation is not liable to a mere abutter for laying its tracks on the surface of the street, as held in *Kellinger* v. *Forty-second St. & G. St. F. R. R. Co.* (50 N. Y. 206); *Fobes* v. *Rome, W. & O. R. R. Co.* (121 N.Y. 505) and similar cases, it is not liable in this case to an abutting owner with no title to the street. In that class of cases, it will be observed, there was no exclusive and permanent occupation of any part of the street except by laying rails upon the surface thereof, without any change of grade, or excavation such as would disturb the stability of adjacent buildings.

Such an occupation does not prevent passage with horses and vehicles over the entire street, and, while somewhat inconvenient, does not exclude travelers from any part of the highway. Those cases should be held where they are and not pushed out of their course by applying them to a situation so utterly distinct as to call for a different rule. Would the decision in either of the cases last cited have been made if the construction involved therein had caused such a subsidence of the soil as to shake adjoining structures from their foundations? If not, they should not be applied to this case.

It has been held in some cases, and we have recently intimated, that the fee of a street has but a nominal value, and so the commissioners of appraisal thought when they estimated the value of the street in front of Mr. Notman's premises and awarded the sum of one dollar to the unknown owners thereof. (*Matter of City of New York (Decatur Street)*, 196 N. Y. 286.) Even if the value is more than nominal, it can be but little more, and I am unwilling to make such a barren and naked title the controlling test to determine whether an abutting owner is entitled to damages for serious physical injury to his property caused by the exertion of enormous hydraulic power upon the sandy soil beneath the street in front of his premises. The real ground on which an abutter is entitled to damages for the physical impairment of his property in a case like this is not that he owns the fee of the street, but owns land abutting on the street. The fee is of slight value and of no value whatever, except to support a theory leading to injustice, for the proximity of his land to the street is what gives value to the abutter's property. "By virtue of proximity," said Judge Andrews in one case, and "by reason of its situation," said Judge Peckham in another, does the abutter have easements and rights in the street which are property entitled to the protection of the law. (*Kane* v. *N. Y. Elv. R. R. Co.*, 125 N. Y. 164, 180; *Bohm* v. *Metr. Elv. Ry. Co.*, 129 N. Y. 576, 587.)

So, in a very recent case, notwithstanding a strong dissent, we said: "It is the proximity of the street, the situation of

the abutting land with reference to an open street, which gives to the abutting owner the special right to the enjoyment and use of whatever is permitted or maintained by the public authorities as a part of the street. * * * The easement extends to all parts of the street which enlarge the use and increase the value of the adjacent lot. It is not limited to light, air and access, but includes all the advantages which spring from the situation of the abutter's land upon the open space of the street. These rights exist whether he owns the fee of the street or not. As they are dependent upon the street and cannot exist without it, they are a part of it and thus become an 'integral part of the estate' of the abutting owner, subject to interference by no one except the representatives of the public. * * * If the plaintiff had owned to the center of the highway, his right to recover damages would be beyond question, yet the difference between such an action and the one before us is theoretical rather than practical, because as long as the street is kept open, which is the invariable rule in cities and the general rule elsewhere, the abutting owner has substantially the same benefit in either case." (*Donahue* v. *Keystone Gas Co.*, 181 N. Y. 313, 319, etc., following *Lane* v. *Lamke*, 53 App. Div. 395.)

The legislature, by the Rapid Transit Act, authorized the city to condemn the easements of abutting owners in order to build an underground railroad, and, necessarily, easements other than light, air and access were referred to, for they appertain to an overhead road. (§ 39.) Light, air and access cannot be interfered with by a road under ground. What easements, then, were meant? What "rights, privileges, franchises and easements, whether of owners, or abutters or others," are interfered with by the construction and operation of such a railroad? What abutting rights did the legislature intend to include in its comprehensive command, unless it is the right to lateral support and the right to protection against physical injuries to buildings on the abutting lots?

I think Mr. Notman, in common with the other claimants, had a right or easement, covered by the statute, which enti-

tled him to compensation for all the damages inflicted upon his property by interference with the lateral support thereof through the proper construction and operation of the underground railroad.

5. Are the claimants entitled to any damages caused by the necessary construction and the proper operation of shafts in the street in front of their properties?

The north shaft was directly opposite the property of Judge Abbott and nearly opposite that of Mr. Mynderse, while the south shaft affected the property of no one here concerned. Mr. Notman made no complaint of either. Twenty by twenty-four feet in dimensions and over sixty feet deep, they were sunk by driving sheet piling with pile drivers and the inevitable effect, according to the evidence, was to jar and crack the neighboring houses. They caused a settling of the soil and inflicted physical injuries on the adjoining buildings in the same way, but not to the same extent, as the construction of the tunnel itself. They were a necessary part of the work of building the subway, for of what use would it be to drive the shield and excavate the soil without getting it out of the way by means of the shafts? The tunnel could not have been built without them and it would be difficult, if not impossible, to separate the injury to lateral support caused by the shield from that caused by the shafts.

The commissioners of appraisal, while they allowed the facts to be proved, did not consider them in making their estimate of the damages. The city in prosecuting the work or causing it to be prosecuted through contractors, was not improving a highway, but building a railroad out of which it could make money, and its liability is that of an ordinary railroad corporation doing the same work in the same way. It can lawfully claim no immunity from liability, except such as would belong to a railroad company, engaged in a similar enterprise, under like circumstances. Although it was conducting a public work, it was such only and to the same extent as the building of a railroad by a private corporation is a public work. While the work was for the benefit of the pub-

lic, it was not for the benefit of the highway, nor for a street purpose, but for a proprietary purpose. The city is liable for the physical injury to the abutter's property caused by the shaft, the same as it is for that caused by the shield. Both were necessary in order to build the road, and no negligence is claimed or shown in the use of either. Any agency, even when properly used in the street, not for the improvement thereof but to promote a business enterprise of the city, which inflicts physical injuries upon the property of abutting owners, imposes a liability that should be met by the city voluntarily, if it chooses, or by an award in condemnation proceedings, if the owner presents and proves his claim within the time and in the manner provided by law. There is no reason why all lawful damages caused by the proper conduct of the work contemplated by the statute, whether inflicted by the city directly in doing the work itself, or indirectly by contracting with some one to do it, should not be included in the award, and the interest and convenience of all parties will be better served by that method than by detached recoveries, partly by action and partly by condemnation proceedings. Such damages are caused by the taking, in the manner authorized by statute, of the property and rights condemned.

6. The measure of damages is the next question in logical order. The rule adopted by the commissioners of appraisal in making their award to Mynderse and Abbott was "the difference in value of their property before the filing of the oaths of the commissioners, and the value immediately after the filing of the oaths of the commissioners, when the title to the property was vested in the city of New York; that if any damage happened by reason of any negligent construction of the contractor, or any damage suffered by reason of the manner in which the work was actually done, beyond such damage as could be contemplated at the time of the vesting of title, such damages can be recovered only in a proper forum, to which the claimants must be limited; that under the Rapid Transit Act the only award that the commissioners in this action can make is the difference in value between the value

of the property before vesting and its value after vesting."
They expressly declared that they did not consider "any
damage to property which has been caused after the taking
by the city in this proceeding."

The rule applied in making the award to Mr. Notman was
to estimate the amount of "damages caused by taking his
easement of support," and nothing else was included in the
award to him.

The commissioners, in limiting their awards to the damages
apparent or foreseen at the date when title vested in the city,
relied on a section of the Rapid Transit Act which provides
that on the filing of their official oaths "the said city shall be
and become seized and possessed in fee or absolute ownership
of" all the property, rights, etc., sought to be acquired. (§ 47.)
The object of this section, however, was to promote the con-
venience of the city by giving it immediate title and posses-
sion, so that it could go to work at once; and also to fix the
date when interest on the award should begin to run, for the
same section further provides that the city shall become
"forthwith liable to the respective owners" for the value of
the property taken, "together with interest thereon from the
time of filing the said oath." As was said below : "There is
no suggestion in the act that the rights of the parties are to
be determined entirely by the condition of the property as it
exists" at a "particular moment."

The measure of damages should be adapted to the actual
injury. What is the nature of the injury inflicted upon abut-
ting properties by building a subway? Obviously, light, air
and access are not injured by an underground road. The
damages are owing to the disturbance of lateral support,
which results in a settling of the soil and thus causes physical
injuries to the adjoining buildings. Therefore, when those
physical injuries are properly valued in money a simple,
direct and just measure of damages is applied.

We think that the proper measure of damages is the full
value of the fee taken, subject to the public easement of
passage, and, both as to naked abutters and those who own

the fee, the amount, measured in money, of the physical injuries inflicted and those which with reasonable certainty will be inflicted upon the abutting property by interference with lateral support through the proper construction and operation of the road, including the rental value of the premises during the period, if any, while they are actually untenantable.

7. The rule of evidence adopted by the commissioners was erroneous. They limited the witnesses in their estimates of value to the time when it was known that the subway was an assured fact by the filing of the oaths, although the work of construction had not been commenced, and instructed them to exclude from consideration any physical damage which had actually been inflicted at the time of the trial, when the work in front of the premises in question had been substantially completed. In estimating the market value on this basis, the experts were confined to supposition and speculation, for filing a paper in a public office worked no physical change in the property, and they were not allowed to consider the realities as shown by time and experience. The test presented to them was what the market value would probably be if an intending purchaser knew that the road was to be built. This left everything open to the mere estimate of experts, not founded on fact but on conjecture. Certainty is better than conjecture and the injuries actually inflicted a better guide than the opinions of experts as to the market values just before and just after the oaths of the commissioners were filed, or during the same five minutes. The value of such evidence, always a dangerous and uncertain guide, and in this case especially so owing to the restrictions of the commissioners, is shown by the fact that experts called by the claimants estimated the amount of the depreciation of the property just after the oaths were filed at fifty per cent of its value just before the oaths were filed, while those called by the city, apparently of equal intelligence and experience, placed it at ten per cent.

We think it was the duty of the commissioners to receive

evidence relating to the condition of the properties down to the time of the trial and to note the effect thereon of the work in fact done at that time. Evidence as to the physical injuries which had actually been inflicted and could be seen, touched and measured, was competent and should have been received, as it was to some extent, and considered, as it was not to any extent. The Appellate Division, therefore, was entirely right in sending back the cases of Mynderse and Abbott for redetermination, with instructions to receive and consider evidence of all physical injuries inflicted upon the property by the proper construction of the work, so far as they could be ascertained at the date of the trial.

8. We are glad, at last, to reach the final question, whether the Rapid Transit Act authorizes the allowance to the abutting owners " of their disbursements, costs, counsel fees and extra allowances."

Section 62 of that act is as follows : " The commissioners of appraisal appointed in pursuance of this article shall receive as compensation the sum of ten dollars per day for each day actually employed. The corporation counsel or other principal legal adviser to said city shall, either in person or by such counsel as he shall designate for the purpose, appear for and protect the interests of the city in all such proceedings in court and before the commissioners. The corporation counsel shall designate assistants to act as clerks to the commissioners of appraisal in all such proceedings without compensation therefor other than their salaries, and shall furnish to the commissioners of appraisal in each proceeding suitable offices and all the assistance which they may require in conducting their proceedings and preparing their reports for presentation to the supreme court for confirmation. The fees of the commissioners and all their necessary expenses in and about the said proceedings provided for by this act and such allowance for counsel fees as may be made by order of the court, and all reasonable expenses incurred by said corporation counsel, or other principal legal adviser of said counsel designated by him for the proper presentation and defense of the interests

of said city before said commissioners and in court, shall be paid by the comptroller or other chief financial officer of said city out of the funds referred to in the last preceding section. But such fees and expenses shall not be paid until they have been taxed before a justice of the supreme court in the judicial district in which said city is situated upon five days notice to the corporation counsel, or other chief legal adviser of said city. Such allowance shall in no case exceed the limits prescribed by section three thousand two hundred and fifty-three of the Code of Civil Procedure." (L. 1909, ch. 498.)

In the absence of a statute providing for costs or allowances for expenses in condemnation proceedings none can be allowed. (*Matter of City of Brooklyn*, 148 N. Y. 107.)

The statute provides for the payment of the fees of the commissioners of appraisal and their necessary expenses, and for the compensation of counsel designated by the corporation counsel to protect the interests of the city, but it does not, as we read it, either expressly or impliedly, provide for the payment by the city of any part of the expenses incurred by claimants for counsel or otherwise. Clearly, disbursements are not allowed, whether for experts, searches or copies of records. While it is true that the section authorizes the payment " of such allowances for counsel as may be made by order of the court," those words are immediately followed by these, " and all reasonable expenses incurred by said corporation counsel." The latter words as well as the entire context indicate that the legislature had in mind only the outside counsel acting or employed in behalf of the city. The counsel for the property owners are not mentioned. The fees and expenses are to be taxed before a justice of the Supreme Court upon notice to the corporation counsel, but as no extra compensation is provided for the services of that officer, and as he designates the unofficial counsel for the city, this is not, as contended, a provision for payment of compensation to himself upon notice to himself, although it does include the reasonable expenses incurred by him. The provisions of the city

charter or of the Code are not involved in the question as certified to us, whether they relate to costs, disbursements, counsel fees or extra allowances, but simply those of the Rapid Transit Act, and we think that act does not authorize the allowances contended for.

I recommend that so much of the order of the Appellate Division as reversed the order of the Special Term denying costs, allowances, etc., to the respective owners, be reversed, but that in all other respects the order of the Appellate Division be affirmed, with separate bills of costs to each respondent; that questions one to four, inclusive, be answered in the affirmative, and question nine in the negative, but that the other questions, owing to their restricted form, should not be answered categorically, or otherwise than is stated in this opinion.

CULLEN, Ch. J.   I concur in the result and in the opinion of VANN, J., save in these respects : I think the right of abutters, not owning the fee of the street to lateral support, as owners of land within the cities of New York and Brooklyn, may be safely rested upon the statute of 1855 (chapter 6), which enacts that whenever excavations on a lot or piece of land in those cities is intended to be carried more than ten feet below the curb, the person causing such excavation to be made must at his own expense preserve the walls on adjoining land from injury and support the same by a proper foundation so that they shall remain as stable as before such excavations were made.   On the faith of this statute there has followed the improvement of those cities, by the erection of buildings of a size and at a cost not then dreamed of. Relying on the protection afforded by the law, investments have been made aggregating hundreds of millions of dollars. As against the owners of buildings erected on the faith of the statute, I do not think it could be repealed so as to impair the rights acquired thereunder.   However, it has not been repealed, and the statute should be construed liberally to afford the protection it was intended to grant.

The statute would not secure an abutting owner from injury caused in the change of a grade of a street (*Radcliff's Exrs. v. Mayor, etc., of Brooklyn,* 4 N. Y. 195), though for such injury he is now entitled to be indemnified by other statutes. Nor would the owners be entitled to damages resulting in the proper construction of what are strictly street improvements, such as the construction of sewers, water pipes, etc. (*Uppington v. City of New York,* 165 N. Y. 222.) But as held over forty years ago (*Craig v. Rochester City & B. R. R. Co.,* 39 N. Y. 404) and reiterated seven years ago (*Peck v. Schenectady Ry. Co.,* 170 N. Y. 298) a street railroad is not a street use. It is no necessary part of the definition of excavation that it should be made downwards from the surface. It is equally an excavation if made by a tunnel. If the city sought to build a court house or a police station it would have to comply with the requirements of this statute. Equally so when it seeks to build a railroad. The obligation of the statute is absolute and unqualified. The person causing the excavation to be made must see to the protection of the adjacent buildings. If he causes it to be done by a contractor he must see that the contractor complies with the obligation that is primarily his. Whenever, therefore, this obligation is violated a cause of action arises, and the abutter is entitled to the damages occasioned by such violation. I do not know that there is any objection to their being determined in a condemnation proceeding where both parties consent and the damage has actually occurred, but that seems hardly the the most appropriate proceeding. The abutter's right of support is violated only when it appears that he has been injured in that respect, and he must be paid when that injury appears. The extent of the injury should not be a matter of speculation in advance but of actuality.

As to the cases of Abbott and Mynderse, who were the owners of the fee of the street, they fall within the decision of *South Buffalo Railway Company* v. *Kirkover* (176 N. Y. 301), in which it was held that where land is acquired by a railroad company by condemnation the owner is entitled to

recover not only the value of the premises taken, but also the damages resulting to the residue, including those which will be sustained by reason of the use to which the portion taken is put. I do not see that *Matter of City of New York (Decatur Street)* (196 N. Y. 286) has any bearing on the question before us. There the owner of the fee of the street had parted with the land on each side of the street, and, in such case, I agree that the fee is of little or no value. Probably in the cases now before the court the fee of the street, if considered solely by itself, is of no greater value, but in connection with the abutting lands it is of this advantage to the owner, that is, it unquestionably entitles him, under the case cited, to compensation for the injury occasioned to that land by the construction of the appellant's railroad.

HAIGHT, WERNER, WILLARD BARTLETT, HISCOCK and CHASE, JJ., concur with VANN, J.; CULLEN, Ch. J., concurs in result, in memorandum.

Ordered accordingly.