(155 App. Div. 262.)

### McCABE et al. v. CITY OF NEW YORK et al.

(Supreme Court, Appellate Division, Second Department. February 7, 1913.)

1. MUNICIPAL CORPORATIONS (§ 278*)—STREETS—GRADE—CHANGE.

 If the grade of a street be raised for the benefit of the public, the change does not become illegal merely because railway companies will also reap as great or greater benefit, and for that purpose set in motion the authorities.

 [Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. §§ 734–738, 744; Dec. Dig. § 278.*]

2. EMINENT DOMAIN (§ 101*)—STREETS—GRADE—CHANGE.

 The grade of a street cannot be changed without compensating adjoining owners for injury to their easements, though the public be benefited, unless the change be for a street use.

 [Ed. Note.—For other cases, see Eminent Domain, Cent. Dig. §§ 269, 270; Dec. Dig. § 101.*]

3. EMINENT DOMAIN (§ 101*)—STREETS—"CHANGE OF GRADE."

 A change in a street, whereby a section of the bed is vested in railroad companies for their exclusive use, with a viaduct overhead to accommodate public travel along the street, does not constitute a change of grade for injuries on account of which adjoining owners could not recover; a "change of grade" being usually understood as an elevation or depression of the surface of a street, or a change of the natural contour of its face so as to facilitate travel over it.

 [Ed. Note.—For other cases, see Eminent Domain, Cent. Dig. §§ 269, 270; Dec. Dig. § 101.*

 For other definitions, see Words and Phrases, vol. 2, pp. 1055, 1056.]

Appeal from Special Term, Queens County.

Action by Marie R. McCabe and others against the City of New York and others. From a judgment for plaintiffs, defendants appeal. Affirmed.

Argued before JENKS, P. J., and HIRSCHBERG, BURR, THOMAS, and CARR, JJ.

Clarence L. Barber, of New York City (Terence Farley, of New York City, on the brief), for appellant City of New York.

A. B. Boardman, of New York City, for appellants Pennsylvania Tunnel & Terminal R. Co. and another.

Stephen O'Brien, of New York City, for respondents.

THOMAS, J. The city acquired Thomson avenue, in Long Island City, and in 1869 established the grade which, in front of plaintiffs'

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

premises abutting thereon, was 9.5 feet above high water mark, but by the changes in question has been raised to an average height of 17.3 feet. Six tracks of the Long Island Railroad Company in a right of way 100 feet wide crossed the avenue, over which many trains passed at grade daily. The Long Island Railroad Company and the Pennsylvania, New York & Long Island Railroad Company (the latter company is succeeded by the Pennsylvania Tunnel & Terminal Railroad Company) applied to the board of estimate and apportionment to change the map or plan of the city by altering, discontinuing, and closing portions of streets and changing the grades of portions of streets, and by laying out portions of new streets in order that the corporation might construct and maintain for the operation of trains terminal facilities. A map or plan accompanying the application shows the yard, the proposed terminal, and the necessary changes in the street, and it was adopted by the board and annexed to and referred to in the contract between the city and the companies, and in the resolutions of the board, and all changes were in accordance with it. The plan, among other things, was to widen the existing right of way from the intersection of Thomson avenue and Purves street for a yard and terminus through a longitudinal distance of two miles. The plan discontinued Thomson avenue as it crossed at grade, and provided for carrying it over the yard by means of a viaduct. The viaduct was in height 32 feet at the northwesterly side of the yard, and, after rising to a maximum height of 46 feet, declined to a grade of 17 feet at Meadow street, the southeasterly terminus of the yard, and finally reached the original grade. But it was the extension toward the northwest that physically affected the plaintiff's property, inasmuch as the approach required an average grade of 17.3 feet. Moreover, a concrete retaining wall was built in front of plaintiffs' property, whereof 13 inches of the foundation occupies plaintiffs' land. The action is to restrain the maintenance and use of the approach to the viaduct in front of the premises and for damages. The judgment is that the plaintiffs are entitled to have removed the wall or embankment, unless the defendants pay them $10,710 for "the damage to plaintiffs' easements of light, air and access and passage to and from said premises over and upon Thomson avenue, and of their property being deprived of light, air, and access on said Thomson avenue," and also the sum of $150 for the trespass upon plaintiff's premises, and taking the same to the extent described. The appeal does not involve the land actually taken. The appellants' contention is that the city of New York, through its authorized instrumentalities and by legal methods, changed the grade of Thomson avenue, and that at common law an abutting owner cannot recover damages therefor, and that the statute (Greater New York Charter [Laws 1901, c. 466] § 951) does not provide for compensation where the land is unimproved, and for this they rely on Sauer v. City of New York, 180 N. Y. 27, 72 N. E. 579, 70 L. R. A. 717; Matter of Grade Crossing Commissioners, 201 N. Y. 38, 94 N. E. 188; People ex rel. Flaxman v. Hennessy, 74 Misc. Rep. 167, 134 N. Y. Supp. 145; People ex rel. Hallock v. Hennessy, 205 N. Y. 301, 98 N. E. 516; Matter of Rapid Transit R. R. Commission-

ers, 197 N. Y. 99, 90 N. E. 456, 36 L. R. A. (N. S.) 647, 18 Ann. Cas. 366, and other authorities.

The plaintiffs contend and the court found, that the railroad companies for the benefit of their terminal facilities applied for closing Thomson avenue over the width of the proposed terminus, and for carrying the avenue over it by a viaduct, and for elevating the grade accordingly, that by agreement the city permitted the companies at their own expense to erect the viaduct upon their assumption of all liability by reason of the construction and agreement to save the city harmless from liability to property, and that, pursuant to the agreement, the companies did the work, and that the agreement and the acts done under it were "illegal and unauthorized, were and are not for a public use, were and are an additional, unlawful burden imposed on said avenue and foreign and beyond any legitimate or lawful use or purpose for which said avenue was created, and a perversion of the legitimate and public use of said avenue, and plaintiffs' rights thereon, and the same were permitted to be and were done to promote and further the railroad enterprises and to provide terminal railroad facilities for the convenience and benefit of the defendant railroad companies contrary to law," and that it follows that there was an unlawful invasion of plaintiffs' property rights, for which they are entitled to compensation as found. The obvious fact is that the railroad companies desired to enlarge their facilities, and that for such end the city should close portions of streets and sell the same to the companies, and that in instances viaducts should be substituted therefor, usually at the expense of the companies, while the city aided the undertaking by using its power to make the changes in the street. The board of estimate and apportionment in the various proceedings taken declared that the changes were for the public interest, and in the principal resolution of February 15, 1907, stated that, "deeming it for the public interest to change the map or plan of the city of New York by closing and discontinuing portions of several streets, changing the grades of existing streets and laying out new streets within the limits of and adjacent to the proposed Sunnyside yard and terminal," it does favor the same. The contract between the city and the companies states the reasons for making it. It is first recited:

"Whereas, the Tunnel Company and the Long Island Company, in order to provide a suitable terminus and suitable terminal facilities for the railroad of the Tunnel Company and to facilitate the proper connection of the railroad of the Tunnel Company with the various lines of railroad of the Long Island Company, and thus to provide better facilities for the accommodation of the traveling public and the freight and other traffic on, and the operation of, the said railroads, and to avoid the crossing of certain streets at grade which are now crossed by the railroad of the Long Island Company, desire to construct, maintain, and operate a terminus, terminal facilities (called 'Sunnyside Yard'), and a freightyard in the borough of Queens, within the territory bounded by" streets named and including Thomson avenue.

It is further premised that the companies have made application to the board of estimate and apportionment to change the map or plan of the city by "changing the grades of portions of streets and avenues

and by laying out portions of new streets and avenues, all hereinafter specifically described, in order that they may construct, maintain, and operate the said terminus, terminal facilities, and freightyard as hereinbefore set forth, and with such application submitted to the said board a plan showing the proposed terminus, terminal facilities, and freightyards." It is further stated that the board of estimate and apportionment, "believing it in the public interest so to do," has authorized said change; that the companies intend to acquire all lands fronting upon portions of streets and avenues closed, and to apply "to the board of commissioners of the sinking fund to sell and convey to the Tunnel Company or the Long Island Company all the right, title, and interest heretofore acquired by the city to the lands within the lines of the portions of the streets and avenues so to be discontinued and closed." Thereupon, in consideration of the discontinuing and closing by the city through its appropriate departments of portions of many streets as described, including Thomson avenue, lying within the right of way, and the changing of the grade in portions of numerous streets, including Thomson avenue, and the agreement of the city to convey to one of the companies "all the right, title, and interest heretofore acquired by the city in and to the lands within the lines of such portions of such streets and avenues so discontinued and closed on such terms and conditions and for such consideration as in the judgment of the commissioners of the sinking fund shall seem proper," reserving easements for subsurface structures by the city, the companies agree that they or one of them will build at their expense certain viaducts, including the one in question, save in one instance, where they agree to pay one-half the expense of a viaduct and grant the city an easement for the continuance of the same where located, and save in another instance when they will so share the expense if the board should consider another viaduct necessary. And the companies agree to cede or cause to be ceded to the city—

"perpetual easement or easements for the rights to continue and maintain the said viaducts or bridges over the following streets or avenues as now laid out or proposed; and will thereby grant to the city a perpetual easement or easements sufficient for the use and control by the city of the said viaducts and bridges for the purpose of police regulation and other control contemplated by the city ordinances for the care of streets or highways, excepting and reserving, however, to the said companies the right to construct and maintain, at its or their own expense, such connections between the said viaducts or bridges, or any of them, and the property of the said companies, as shall not interfere with the use of the said viaducts or bridges for street purposes."

Then are specified several viaducts, and as to the one over Thomson avenue it is said:

"The said viaduct or bridge over the proposed Sunnyside Yard on the line of Thomson avenue, hereinbefore in paragraph 1C, set forth, including the right to the city to increase, at its own expense and without interfering with the operation of the said Sunnyside Yard, the width of said viaduct to be one hundred feet."

The intention of the companies was to enlarge the terminal laterally by acquiring from the city title to the land in the closed streets wherever necessary, and by acquiring the lands abutting there-

on from private owners. To do this it was necessary to close the streets across the right of way as broadened, so that the companies could have the fee and possession thereof for railroad purposes. But in some instances, and among them at Thomson avenue, in the place of the portion of the street closed and agreed to be sold a viaduct over the yard was provided and built, and it was necessarily so high over the tracks that the grade of the avenue at either end was necessarily raised to meet it. In other words, over the space where the avenue was obliterated and its bed agreed to be sold a bridge was built, and the abandoned portion made a part of the terminal facilities. The grade of the avenue was raised for the purpose of approaching the viaduct at either end. The companies suggested it, and induced it to be done. It was for their immediate and primary benefit that it should be done. By it they obtained terminal facilities of greatly increased dimension, uninterrupted and unembarrassed by any street uses. But their benefit, however direct or however great, does not exclude benefits to the general public in whose behalf it is highly important for the safety of travelers that a viaduct should be built. The terminal was necessarily enlarged, and for that purpose the companies could, unaided by the city, acquire the abutting land on the many streets over which its many trains would pass, and it was in the public interest that travelers should be delivered from jeopardy by overhead and under crossings. It is generally, if not always, the case that a crossing other than at grade is, if practicable, a public benefit, and over the terminal of an important railway line it removes from the traveler many perils and the burden of extreme care. Whether the yard was or was not enlarged, the overhead crossing might well be deemed for the public interest. It was also in the public welfare that the companies were compelled to pay in so great part for the changes to be made. Hence, the public interest was subserved by furthering the interests of the companies even to burthening the latter pecuniarily. If the things to be done were for the public interest, it is an unjustified inference that, because the interests of the companies were largely concerned, the good of the public could not be enhanced by what was proposed.

[1-3] So I conclude that, if the grade of a street be raised for the benefit of the public, the action of the authorities does not become illegal merely from the fact that railway companies will also reap as great or greater benefit, and for that purpose set in motion the authorities. But this conclusion is only a step forward. The public may be benefited, but the change made must be for a street use. Matter of Rapid Transit R. R. Commissioners, 197 N. Y. 81, 105, 106, 90 N. E. 456, 36 L. R. A. (N. S.) 647, 18 Ann. Cas. 366. If the change of grade is not for a street use, then there must be compensation for injury to plaintiffs' easements. The respondents insist that the declarations in the resolutions and agreements that it is for the public interest is not conclusive of the fact, but that the court may scrutinize the undertaking to discover whether the declared fact is the fact. What are some street uses has sometimes been determined, and references to decision in that regard are made in the Matter of Rapid Transit R. R. Commissioners, supra, 197 N. Y. 81, 97, etc., 90 N. E. 456, 36 L. R. A. (N. S.) 647, 18 Ann. Cas. 366. There the determina-

tion of the question depended upon the capacity in which the city acted, as well as upon the nature of the undertaking. The street below the surface had been appropriated by the city, not in its governmental capacity, but as the proprietor of a railway and the franchise to operate it; and the undertaking required the appropriation of the street beneath its surface and the physical disturbance of the street. In the case at bar the embankment raised in front of the plaintiffs' premises will be used on its surface only for the traveling public, and below the surface there may be usual appropriations to sewers and similar facilities. The viaduct on its surface will also be used for public travel. The railroad companies do not share in that kind of use. The grade in front of the plaintiffs' premises was raised so as to meet and form with the viaduct a way. It is undoubted that the viaduct was raised to its present height, thereby necessitating the change of the grade of the approach, for the primary purpose of allowing the companies to pass under it, and to acquire for its uses by purchase that portion of the avenue which was closed, so that the yard in all its new limits would be at the free and uninterrupted service of the companies. The whole plan was the conception of the companies, and while it was for the public interest, as the city conceived, that the plan should be adopted, yet, as the contract states in the leading premise, it was "in order to provide a suitable terminus and suitable terminal facilities for the railroad of the Terminal Company, * * * and to avoid the crossing of certain streets at grade which are now crossed by the railroad of the Long Island Company." But, even so, if there be merely the substitution of a viaduct for a grade crossing, and the closing of the street thereunder, the plaintiffs are not entitled to compensation, whatever the actual damage to their adjoining property.

But the vital question is, Was the undertaking in its essential quality a change of grade? I do not regard the extent of the change. The power is the same whether the map be changed as to one or many streets. I do not consider the mere fact that portions of streets are closed at grade over the tracks and in instances viaducts substituted. Conceding the power, the degree of its exercise is unimportant. But one essential of the plan was to convey the title to the streets closed. What is the result? There is no continuing street owned by the city passing plaintiffs' premises. True, the plaintiffs may pass from the approach onto the viaduct. But who owns that? The companies own or will own the land under it, subject to easements for sewers and similar purposes, but the viaducts will be built over the land of the companies. What are the proposed property interests of the city therein? "Easements for the right to continue and maintain the said viaducts or bridges over the following streets or avenues as now laid out or proposed; * * * a perpetual easement or easements sufficient for the use and control by the city of the said viaducts and bridges for the purpose of police regulation and other control contemplated by the city ordinances for the care of streets or highways." The city may undoubtedly use the viaducts for street purposes, and the companies may interconnect them for their purposes. The companies will own the land supporting the viaducts. The city will maintain and police

them. But thereby has the city changed the grade within the meaning of section 442 of the Greater New York Charter? The appellants are contented to assume that such is the fact and to show consequent non-liability. But a change of grade, as usually considered, is an eleva-tion or depression of the surface, or a change of the natural contour of its face so as to facilitate travel over it. But here portions of many streets are taken from the ownership of the city, their beds ap-propriated to the business of the new owners, viaducts in place built by them, and passage for the public thereon provided, and right of maintenance and power to protect them ceded. This, in my judgment, is not change of grade but disposition of streets for railway facilities, with substituted right of passage along viaducts built by the companies over their land, with accompanying power to the city to maintain and to police. In brief, the city has sold its streets, and in return obtained a right of way over some viaducts built and presumably owned by the vendee, to which is superadded the duty of maintenance and policing by the city.

The judgment should be affirmed, with costs. All concur.