LESTER J. SINSHEIMER Doing Business under the Name of J. SINSHEIMER & SON, Respondent, *v.* THE UNDERPINNING AND FOUNDATION COMPANY, Appellant.

First Department, June 8, 1917.

Damages — action at law — basis of damages — consideration of acts after commencement of action — consent of parties — municipal corporations — city of New York — liability of contractor in construction of subway to lessee of land for interference with easements of light, air and access.

Where, in an action at law by a lessee of property abutting upon a street in the city of New York against a contractor with the city engaged in the construction of the subway, to recover damages for the interference with

the plaintiff's easements of light, air and access, caused by certain structures erected by the defendant, the parties consent to the determination of the defendant's liability for the presence of the structure, which had been transferred to another for a period after the commencement of the action, and such issue is presented to the jury without objection, the defendant is not in a position to attack the recovery upon appeal, although, as a general rule, anything happening after the commencement of an action at law cannot be used as the basis of damages.

A lessee of land abutting on a business street in the city of New York has an easement in the highway for light, air and access by reason of the situation of his property, which cannot be taken from him without just compensation, and the city in constructing the subway through its contractor discharges a proprietary and not a governmental function rendering it liable for any interference with the easements of light, air and access, although the work is done without negligence, in the most approved manner, and for the furtherance of a great public convenience.

APPEAL by the defendant, The Underpinning and Foundation Company, from a judgment of the Supreme Court in favor of the plaintiff, entered in the office of the clerk of the county of New York on the 24th day of May, 1916, upon the verdict of a jury for $5,500, and also from an order entered in said clerk's office on the same day denying defendant's motion for a new trial made upon the minutes.

*Herman Aaron*, for the appellant.

*Nathan L. Miller* [*Louis J. Vorhaus* with him on the brief], for the respondent.

DOWLING, J.:

This action is brought to recover from the defendant, which was engaged in the erection of a section of the subway on Broadway, damages claimed to have been sustained by reason of the erection, maintenance and operation by defendant on the street and sidewalk in front of plaintiff's demised premises of certain structures used in the work of excavation and construction, and from which said work was prosecuted for a considerable distance north and south of the said premises thereby interfering with plaintiff's easement of light, air and access, and imposing an undue and excessive burden upon his premises as against other premises along the section of the subway served by such structure. The answer is a general

denial and a defense that the structures complained of were authorized by the Public Service Commission and were merely temporary and incidental to a work of public necessity performed without negligence in the construction of a portion of the rapid transit railroad, pursuant to a contract between the defendant and the city of New York.

There is but little dispute as to the facts. Plaintiff was the lessee of the store, basement and sub-basement of the premises No. 593 Broadway and No. 186 Mercer street thirty feet in width by two hundred feet in depth. Of these premises he had been the occupant since February 1, 1907, and at the time in question he was in possession under a lease for five years from February 1, 1911, at a yearly rental of $7,500, conducting therein a wholesale business as a dealer in hosiery and knit goods. Of the Broadway front the northerly five feet were used for an entrance to the upper part of the building, and of the remaining twenty-five feet, about fifteen feet were occupied by a show window, beginning about two feet from the level of the sidewalk and extending to the ceiling of the store, which was about eighteen feet in height. The entrance to plaintiff's store was at the southerly end of the building. Adjoining it and at right angles to the main show window was another window extending to the same height; the entrance door was of glass above a three-foot wooden panel. Broadway is eighty feet wide at this point. Before the operations in question, the light entering plaintiff's premises was sufficient to enable business to be done therein during the spring and summer months until four o'clock in the afternoon, without artificial light, to a distance of about one hundred and twenty-five feet from Broadway. Defendant was the contractor with the Public Service Commission for the construction of a section of the Lexington Avenue Rapid Transit railroad on Broadway, from a point near Howard street to about the middle of the block between Prince and Bleecker streets, a total length of two thousand six hundred and eleven feet. The method of construction adopted for the work was the most approved one, known as the "cut and covered" method, by which the annoyance to abutting property owners was minimized and the obstructions to street

First Department, June, 1917.          [Vol. 178.

and sidewalk travel made as little as possible. Under this method a portion of the street surface is removed at night and planks installed in place thereof so that by daylight the street is in condition for uninterrupted travel thereupon. It is a more expensive method than the one formerly adopted, known as the " open cut " method, under which the entire street was excavated and left open, with the exception of car traffic, and the sidewalks interfered with as well. There is no question that the best and most approved (as well as the most expensive) method of construction was adopted, in order to make the discomfort and loss as little as possible during the progress of the work. The Public Service Commission determined that it was necessary that shafts should be sunk and operated for the removal of the excavated material and for the prosecution of the work underground; and the defendant finally erected two double shafts, one of which was located in front of plaintiff's premises. In March, 1912, the defendant erected in front of the premises in question the structure which is the cause of this suit. It consisted of a bridge composed of heavy, steel girders supported at both ends by wooden struts (twelve-inch by twelve-inch timbers) inclosing a shaft and supporting bins for the excavated materials. This bridge was floored over and on the bridge were two stiff-legged derricks, each serving a shaft on opposite sides of the street. There were bins on each side of the bridge to contain excavated material and housing for the hoisting machines, two in number, each of which served a derrick. The substructure of the bins was boarded up for its full height to the underside of a fire escape in front of the store and there was a platform extending out from the bins towards the fire escape, this platform being erected to accommodate the derrick signalman. The plans and photographs show the substantial character of this structure. On the westerly side of Broadway in front of the store in question, and on the northerly part thereof, was the shaft, the outside dimensions of which were about nine feet six inches in width and fourteen feet three inches in length. Then came to the south the substructure of the bins fifteen feet four inches in length by six feet nine inches in width. It was this latter structure which was boarded up to above the first floor, level, the

northerly structure being boarded up to a man's height. Thus out of the thirty-foot frontage of plaintiff's demised premises the southerly twenty-five feet embracing the entrance and show window were completely covered by the structures erected by defendant, the five feet not so covered being the northerly part, in which was the entrance to the upper part of the building. The sidewalk in front of plaintiff's premises was seventeen feet wide. Plaintiff introduced evidence to the effect that some twelve feet of this were taken up by the substructure, leaving a passageway between five and six feet wide, while defendant contends that the width of the passageway left was seven and one-half feet. The superstructure overhanging the substructure, as has been said, extended as far as the fire escape, thus making a completely covered passageway in front of the plaintiff's store. The entire operation of the excavation and removal of material and of construction, was carried on from these two shafts; the one in question being a little north of the center of the work on the north end, and there being another a little south of the center of the work on the south end, below Grand street. There is testimony that the effect of this construction was to darken plaintiff's store so that he had to keep it lit by artificial light all day, the defendant itself furnishing a lamp for use in the vestibule, from about half past four or five o'clock in the winter time. The light was insufficient to properly show goods to customers within the store and they had to be taken to the front thereof or to the windows on the Mercer street side, and sometimes even into the vestibule to enable the color and texture of the goods to be discerned. The accessibility of the store was affected and its visibility so obscured that the plaintiff's business sign could not be observed either from the other side of the street or from the north or south, nor in fact anywhere save from within the passageway. The passageway itself became so crowded at times with people watching the operations in the shaft that a sign was erected at the suggestion of the Public Service Commission: " Danger. Keep moving." This condition remained practically unchanged from · March, 1912, until December, 1913, at which time the defendant's work under its contract was completed; but instead of removing the

structures in question the defendant entered into a contract with the Dock Contractor Company on October 7, 1913, by which for the sum of $15,000 it gave that company the right to use the structures for its work in constructing the section to the north, despite the protests of the plaintiff. The Dock Contractor Company conducted its operations from this structure and it was not removed until December, 1914. Plaintiff's recovery herein is solely for the interference with the plaintiff's easement of light, air and access, no damage being claimed by plaintiff, nor allowed by the court, on account of noise or anything in the nature of a nuisance. The diminution of rental value by reason of the structure was testified to by two experts, one of whom gave the amount of loss as $4,000 a year and the other as $5,148.80.

The first point raised by the appellant which requires consideration is that error was committed in allowing a recovery herein which embraces damages for the period during which the Dock Contractor Company was in possession of the structure in question. This action was commenced May 18, 1913. Plaintiff has recovered the damages caused to him by the maintenance and operation of the structure complained of during the entire time of its continuance and until its removal, which included the occupancy by the Dock Contractor Company. The action being one at law, anything happening after its commencement could not be used as the basis of damages. (*Pond* v. *Metropolitan Elevated R. Co.*, 112 N. Y. 186; *Ottenot* v. *New York, L. & W. R. Co.*, 119 id. 603; *Tallman* v. *Metropolitan Elevated R. R. Co.*, 121 id. 119; *Amerman* v. *Deane*, 132 id. 361.) But parties have a right to try their controversies in their own way in the absence of objection, and it is quite obvious that the plaintiff and defendant were equally willing that the issue of defendant's liability, if any, should not alone be determined, but that they were both agreed that if defendant was liable the entire amount of plaintiff's damage should be determined in this action and that he should recover therein not only the damage which he sustained down to the time of the commencement of his suit, but also his entire damage down to the removal of the structure by the Dock Contractor Company. An examination of the record satisfies us that this is

the case, and it is further confirmed by the fact that all the evidence as to the occupancy and use of the structure by the dock company after defendant had completed its contract was received in evidence without any objection upon the part of the defendant. Furthermore the court in his charge to the jury said: " The defendant is  responsible for the time during which this entire structure remained in front of the premises of the plaintiff, if the plaintiff is entitled to any damages, for the reason that the fact that the defendant gave the right to some other concern, which did not even have the excuse that might morally have been presented, we will say, by the defendant to use this structure. This makes the defendant liable for the entire time that the structure was there. So that the damages must be measured by the entire period of time, commencing from the time that it was put up until the time that it was removed. I do not remember the exact period. It was something like three years; is that right? Mr. Cochrane [defendant's trial counsel]: Two years and ten months. The Court: Two years and ten months." To this part of the charge there was no exception. Later on the jury was recalled for further instructions, in the course of which one of the jurors asked: " Your Honor, will you repeat your part of the charge of having to take the loss for three years, that is, not splitting it up, for instance, with the Dock Company. The Court: You have a right to give damages for the entire time that the structure remained in place, which is about three years, or a little less than three years. Mr. Cochrane: I will have to except to your Honor's charge in that form. The Court: In that way; what is the objection to it? Mr. Cochrane: They must first find that there was a damage through its invasion, through these elements. The Court: I know; there is no question about that. He is asking me as to the length of time merely. The Ninth Juror: Must it be for the entire time, or not at all? The Court: Yes. I tell you, if you give damages, you must give it for the entire time. The Twelfth Juror: It must be for the three years? The Court: Whatever it is. The First Juror: Two years and ten months. The Court: Two years and nine or ten months; I will not say it is just three years, but whatever time it was there, that is all I say. You

cannot give it for one month or two months. If you give damages, you must give them for the entire time the structure was there. That is the law of the case." To these instructions no exception was taken. We find no error, therefore, in the submission to the jury under the rule just laid down by the court, without exception, for the determination of the issue which the parties were willing the jury should decide. The defendant's acquiescence in that ruling and in such decision prevents its now attacking the recovery upon appeal. (*Caponigri* v. *Altieri*, 165 N. Y. 255; *Lahr* v. *Metropolitan Elevated R. Co.*, 104 id. 268.)

The remaining question in the case is whether upon the facts proven there was any liability whatever upon the part of the defendant for the construction and operation of the shaft and structures in question, or whether it is a case where private rights must yield to temporary inconvenience and loss arising from acts done in the public interest performed under legislative authority; in which case, in the absence of negligence, the persons performing the work under such authority in good faith are not liable for consequential damages. In other words it is claimed to be a case of *damnum absque injuria.* The respondent relies largely upon the cases of *Bates* v. *Holbrook* (171 N. Y. 460) and *Matter of Rapid Transit Railroad Commissioners* (197 id. 81). It is quite true that in the former case the court said (p. 469): " Damages which are inflicted upon abutting property owners in the performance of public work, reasonably and properly conducted, are regarded as *damnum absque injuria.* This exemption rests upon the necessity of the situation and commends itself to all reasonable minds. The necessary injuries and annoyances inflicted upon this plaintiff, in the proper prosecution of this work, arise from the opening of the street in Fourth avenue, on the east side of his property, and the construction of the subway, by blasting, and other necessary work, involving obstruction, noise and general inconvenience. When this portion of the work is accomplished and the street restored to its normal condition opposite his property, the annoying situation would cease as to him. If, however, the structures, of which complaint is made, are to be maintained during the entire prosecution of the work on defendant's section, the

plaintiff is subjected to annoyances and injuries that are neither necessary nor reasonable." But that case was decided upon its own peculiar facts and presented a situation which rendered it somewhat unique so that the court felt called upon to say (p. 471): "We wish to be understood as deciding this case upon its peculiar facts and not laying down any general rule as to the conduct of this subway work. It is impossible to so precisely regulate the damages as to prevent greater loss to one abutting owner than another under apparently like circumstances. What we do hold is that these defendants ought not to be permitted to continue a condition of affairs that is rapidly reducing this plaintiff to bankruptcy when the trial court has found in substance that the structures of which complaint is made, are not necessary for the reasonable prosecution of the work." In that case the burden of bearing the loss and damage entailed by the maintenance of the buildings opposite plaintiff's hotel, which constituted a nuisance, were cast solely upon him while that loss could have been lessened to the plaintiff if the plant had been placed in a less frequented section, or if smaller plants had been distributed along the line of the work. Furthermore, the buildings complained of had been erected in a public park without any warrant of law and were permanent, in the sense that they were devoted to the prosecution of the entire work of the defendant's construction, and not merely of a subdivision thereof. The case was called by the court one of peculiar hardship and every warning was given that it was decided solely upon its peculiar facts and was not to be taken as a general guide. Even in that case, however, Judge O'BRIEN dissenting (with him Chief Judge PARKER) deemed it governed by the rule enunciated by Judge MARTIN in *Fries* v. *New York & Harlem R. R. Co.* (169 N. Y. 282): "In every civilized community controlled by governmental or municipal laws or regulations, there are many cases where the individual must be subjected to remote or consequential damages or loss to which he must submit without other compensation than the benefit he derives from the social compact." So that the *Bates Case* (*supra*) is not controlling in the case at bar. I can find no way, however, of distinguishing this case in principle from the *Joralemon Street* case (*Matter of Rapid Transit*

*Railroad Commissioners*, 197 N. Y. 81). There the Court of Appeals held (p. 97): "The use made of the street by the city in constructing the subway and operating, or causing to be operated, a railroad therein, is not a street use as that term is known in the law." The court also said (p. 96): "The city owns the subway, and it is a railroad corporation so far as the construction, operation and leasing thereof is concerned. It was not required, but simply permitted, to build and operate the road. * * * In other words, the subway is a business enterprise of the city, through which money may be made or lost, the same as if it were owned by an ordinary railroad corporation. It was built by and belongs to the city as a proprietor, not as a sovereign. * * * The construction of the subway comes within none of the apparent exceptions to the command of the Constitution that private property shall not be taken for public use without just compensation." And at page 102: "It is well established that a railroad corporation cannot interfere with the easements of light, air and access without liability." And further (p. 105): "The city in prosecuting the work or causing it to be prosecuted through contractors, was not improving a highway, but building a railroad out of which it could make money, and its liability is that of an ordinary railroad corporation doing the same work in the same way. It can lawfully claim no immunity from liability, except such as would belong to a railroad company, engaged in a similar enterprise, under like circumstances. Although it was conducting a public work, it was such only and to the same extent as the building of a railroad by a private corporation is a public work. While the work was for the benefit of the public, it was not for the benefit of the highway, nor for a street purpose, but for a proprietary purpose. * * * Any agency, even when properly used in the street, not for the improvement thereof but to promote a business enterprise of the city, which inflicts physical injuries upon the property of abutting owners, imposes a liability that should be met by the city. * * * There is no reason why all lawful damages caused by the proper conduct of the work contemplated by the statute, whether inflicted by the city directly in doing the work itself, or indirectly by contracting with some one to do it, should

not be included in the award." The same case also holds that it is not necessary that the abutting owner should own the fee in the street to be entitled to recover damages (p. 103). " The real ground on which an abutter is entitled to damages for the physical impairment of his property in a case like this is not that he owns the fee of the street, but owns land abutting on the street. The fee is of slight value and of no value whatever, except to support a theory leading to injustice, for the proximity of his land to the street is what gives value to the abutter's property. ' By virtue of proximity,' said Judge ANDREWS in one case, and ' by reason of its situation,' said Judge PECKHAM in another, does the abutter have easements and rights in the street which are properly entitled to the protection of the law." (*Kane* v. *N. Y. Elev. R. R. Co.*, 125 N. Y. 164, 180; *Bohm* v. *Met. Elev. R. Co.*, 129 id. 576, 587.) (See, also, *Donahue* v. *Keystone Gas Co.*, 181 N. Y. 313.) That the owner of land abutting on the street has an easement in the highway for light, air and access and such easement constitutes property which cannot be taken from its owner without just compensation has been decided in *Story* v. *New York Elevated R. R. Co.* (90 N. Y. 122); *Lahr* v. *Metropolitan Elevated R. Co.* (104 id. 268), and *Muhlker* v. *Harlem Railroad Co.* (197 U. S. 544). This court has also held in *Ogden* v. *City of New York* (141 App. Div. 578) that where the city constructs public docks for which it is to receive rent and dockage charges and in so doing excavates a public street leading thereto so that an abutting owner is cut off from access to his property for two years and part of his land falls into the excavation for lack of lateral support, he is entitled to recover substantial damages. This was upon the ground that the excavation was not for a street use, but on the contrary the city was embarking in a business enterprise from which it was to receive compensation, so as to make it liable like any other person or corporation engaged in a similar enterprise. That case was decided upon the authority of *Matter of Rapid Transit Railroad Commissioners* (197 N. Y. 81) and *Muhlker* v. *Harlem Railroad Co.* (197 U. S. 563). While I dissented from the conclusion reached by the court therein, the determination of the court is binding upon us. So also the Appellate Division of the

Second Department in *Bradley* v. *Degnon Contracting Co.* (157 App. Div. 237) held that the use of Seventy-ninth street in the borough of Brooklyn from Fourth avenue to the Shore road, a distance of half a mile, for a tramway whereon to transport earth filling for use in constructing a sea wall in connection with the subway construction in said borough was not a highway use, and that, therefore, the abutting owners were entitled to an injunction which the Special Term had granted restraining the laying and use of the tramway, no compensation having been provided for to the abutting owners. The court said: " When the whole facts are before the court at Trial Term, the court may determine whether it will award injunctive relief absolutely, or conditionally, upon the failure of defendants to make such provision as it may direct for the indemnification of the plaintiffs against such damages as may follow. It is, of course, desirable that these great public works should be expedited in every way consistent with the protection of individual rights, but the fact that the public at large may be benefited will not justify the imposition of undue burdens upon a special locality and an invasion of the legal rights of individuals in such localities."

The conclusion to be deduced from these cases, therefore, is that the plaintiff, as the lessee of the land abutting on the street, had an easement in the highway for light, air and access by reason of the situation of his property; that such easement constituted property which could not be taken from him without just compensation; that the city in constructing the subway, through its contractor, was discharging a proprietary and not a governmental function; that its liability was that of a railroad corporation; and that a railroad corporation is liable for any interference with the easement of light, air and access. All this although the work was done without negligence, in the most approved manner, and for the furtherance of a great public convenience. So the United States Supreme Court in *Muhlker* v. *Harlem Railroad Co.* (197 U. S. 544) held that an abutting owner could not be deprived of his easements of light and air above the surface of the street without compensation, even though the raising of the structure in front of his premises from a surface to an elevated one gave him an increase in his easement of access, and in so holding

said (p. 571): "They [the cases] are collected in 1 Lewis Eminent Domain, section 91c, and, it is there said, 'established beyond question the existence of these rights, or easements, of light, air and access, as appurtenant to abutting lots, and that they are as much property as the lots themselves.'" Nor are we unmindful of the danger in upholding plaintiff's right to recover, that unless provision is made for the compensation of abutting owners under such conditions as have been disclosed by this record it will be possible to enjoin the prosecution of a great public work until provision has been made for the adequate protection of the rights of owners, and that the furnishing of such protection, to the satisfaction of the court, will be a matter of great difficulty because of the uncertain and speculative character of much of the damage which must ensue and which can only develop during the prosecution of the work itself. But this does not affect the application of the principle enunciated in the cases which have been cited, and the judgment, therefore, must be affirmed, with costs.

CLARKE, P. J., LAUGHLIN, SMITH and DAVIS, JJ., concurred

Judgment affirmed, with costs.